**AFFIDAVIT OF DANIEL G. CRONIN**   19-MJ-5254-JGD

I, Daniel G. Cronin, being duly sworn, depose and state as follows:

1. I am employed as a police officer by the Town of North Andover, Massachusetts and have been employed as such for twenty-nine years. For the last twenty-four years I have been assigned as a Detective to the Criminal Investigation Division. For the last three years, I have been assigned as a Task Force Agent to the FBI Lowell Resident Agency. I have investigated hundreds of crimes against both persons and property including, but not limited to burglaries, narcotic offenses, larcenies, and sexual assaults. I have participated in over 100 narcotic investigations and have been involved in the arrest and prosecution of over 75 individuals for various narcotic offenses. I have also received advanced specialized training in the following areas: narcotics investigations from the Drug Enforcement Administration, with specialized training in the application and execution of search warrants; and a computer forensics class from Fox Valley Technical College at Portsmouth, New Hampshire. Additionally, I have received specialized training related to criminal activity over the internet,

~1~

sponsored by the North East Municipal Law Enforcement Council (N.E.M.L.E.C.), Computer Crime Unit, at Boston, Massachusetts, and the Chelmsford, Massachusetts Police Department.

2. As a FBI TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code. I am a "federal law enforcement officer" as defined by Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. I have participated in the investigation described in detail below. During my work on this investigation, I have interviewed witnesses about their knowledge of the matters described below. I have also conducted surveillance and discussed this case with other law enforcement officers who have assisted in this investigation. As a result of my personal participation in this investigation, through my conversations with other law enforcement officers, I am familiar with this investigation.

4. This affidavit is submitted in support of an application for a criminal complaint charging **WILLIAM CABRERA** with knowing possession of heroin (a Schedule I controlled

substance) and oxycodone, (a Schedule II controlled substance), with intent to distribute and distribution of heroin in violation of Title 21, United States Code, Section 841(a). On June 27, 2019, **CABRERA** was arrested after he sold heroin to a confidential source (hereinafter "CI-1") operating at our direction. After **CABRERA**'s identity as the seller of the heroin had been confirmed, we obtained a search warrant on **CABRERA**'s residence that resulted in the seizure of, among other things, additional heroin, 200 oxycodone pills, approximately $16,000 in cash, and a loaded 9mm firearm with an obliterated serial number.

5. This affidavit does not set forth all the facts developed during the underlying investigation. Rather, it sets forth facts I believe to be sufficient to establish probable cause that **CABRERA** committed the crime set forth in the accompanying Criminal Complaint.

### FACTS ESTABLISHING PROBABLE CAUSE

7. At approximately 2pm on June 27, 2019, myself and other officers, involved in a drug investigation in the Lawrence area, saw a black Volvo with New Hampshire plates drive away from Lawrence and pull into a parking space at 30 Massachusetts Avenue, which I and other officers know to be a well-known

distribution point for selling fentanyl, particularly to customers coming from New Hampshire.

8. Once parked, officers saw the Volvo's two occupants looking around in a manner consistent with counter-surveillance (that is, looking for police presence) and then begin to manipulate an item at the center console of the car. Believing that these actions were consistent with someone preparing to use drugs, myself and other offices approached the car.

9. Upon our approach, we saw that the driver (hereinafter referred to as "CI-1") was holding a rolled up dollar bill (commonly referred to as a "push rod") used to snort fentanyl and other powder drugs such as heroin and that the passenger (hereinafter referred to as "CI-2") was holding a paper fold containing an off-white powder consistent in appearance with fentanyl and heroin.[1]

---

1 CI-1 has a criminal record that consists mostly of motor vehicle offenses, three of which were continued without a finding after an admission to sufficient facts. CI-1 also has arraignments on its Massachusetts Board of Probation Records for being a fugitive from justice and for larceny under, both of which were dismissed. CI-1 is a user of drugs and is cooperating with law enforcement for consideration on the drug offense committed earlier today. CI-2 also has a more substantial criminal record but we are not relying on anything CI-2 told us to establish the requisite probable cause.

10. We then announced our presence and saw the occupants throw both the paper fold containing the suspected fentanyl and the push rod onto the floor of the car. In response, we ordered both occupants to get out of the car so they could be frisked for weapons or other contraband. As we did so, other officers attempted to collect as much of the suspected fentanyl as possible and confirmed that, based on its appearance, color, the manner in which the occupants of the Volvo were preparing to use it, and the prevalence of fentanyl as the drug of choice in the Lawrence area, that the substance was fentanyl.

11. The occupants thereafter agreed to speak with us about the powder that had been in the fold and where they got it. Each identified it as fentanyl and stated that CI-1 had purchased it earlier in the day from a Hispanic male that they knew only as "Willie" but who we later identified as **CABRERA**. They stated that they contacted **CABRERA** by phone using number 978-973-5151 and asked to purchase a gram of fentanyl with the possibility of buying larger qualities if the quality of the drugs was good.

12. **CABRERA** directed CI-1 and CI-2 to 88 Bailey Street in Lawrence and to park on the driveway. Once at the Target Premises, CI-1 went to the side door and knocked on the screen.

13. CI-1 then heard an individual coming down stairs from the second floor before opening the side door and identifying himself as "Willie" and who was later determined to be **CABRERA**. CI-1 then quickly exchanged $40 for a gram of what CI-1 believed to be fentanyl. **CABRERA** also asked CI-1 to pull the car all the way into the driveway the next time CI-1 came.

14. At our request, CI-1 then texted **CABRERA** at 978-973-5151 to ask about buying 10 grams of fentanyl (commonly referred to on the street as "a finger"). In response, **CABRERA** texted CI-1 an emoji of a hand but did not otherwise respond.

15. After a short wait, CI-1 was directed to place a call to **CABRERA** which CI-1 did in my presence. In that call, CI-1 told **CABRERA** that it did not understand the emoji that **CABRERA** had texted. **CABRERA** asked how much CI-1 wanted and CI-1 told **CABRERA** a finger. **CABRERA** agreed and told CI-1 that a finger would cost $300 and that CI-1 should come back to the house (a reference to the Target Premises) to pick it up.

16. We then prepared CI-1 to make the buy by giving it $300 in buy money and completing an earlier pat frisk to see if CI-1 had any cash or contraband on its person. CI-1 then returned to the Volvo that was surveilled as CI-1 and CI-2 drove back to the Target Premises where other agents had established

surveillance positions.

17. Once at the Target Premises, CI-1 went to the side door and went inside. CI-1 came out about two minutes later and was followed back to a predetermined meeting location.

18. Once back at the meeting location, CI-1 turned over the drugs that **CABRERA** had sold to CI-1 to me and was frisked for a second time. I then debriefed CI-1. CI-1 told me that **CABRERA** (who he/she continued to refer to as "Willie") came to the side door and took him/her up the stairs to the second floor apartment that appeared to be lived in. Once there, **CABRERA** threw a finger of fentanyl on the kitchen table and CI-1 paid him $300, took the drugs, and left. CI-1 described **CABRERA** as a Hispanic man of average height wearing a white sleeveless T-shirt (of a type sometimes called a "wife beater") and jeans.

19. Once CI-1 was debriefed, two Lawrence Police officers approached the Target Premises to see if they could speak with "Willie." They knocked on the same side door that CI-1 had used and were met by a Hispanic male who matched the description provided by CI-1. When one of the officers inputted 978-973-5151 into his cellular telephone, Willie's phone rang. At that point, **CABRERA,** was told that the Target Premises (that he stated was his) was going to be frozen for a search warrant and

that he was placed under arrest.

20. After **CABRERA** had been placed under arrest and I was advised that he had been Mirandized, I had a brief conversation with **CABRERA**. He told me that he had a criminal record that included a conviction for receiving stolen property and a sealed proceeding for drug distribution (that in fact also included a firearm offense with all charges eventually dismissed). In another post-Miranda statement made during booking, **CABRERA** told TFO Bob Heffernan that there might be a gun in his second floor apartment.

21. We then obtained a search warrant for the 88 Bailey Street, Second Floor Apartment, Lawrence, MA ("the Target Premises"). During the execution of the warrant, we seized 12 grams of a powder that field tested positive for heroin and was similar in appearance to the drugs purchased by CI-1 from **CABRERA**, approximately 200 pills that field tested positive for oxycodone, drug paraphernalia (a scale and numerous baggies), and a loaded 9mm firearm with an obliterated serial number as well as the buy money that CI-1 had used to make the ten gram purchase described above.[2]

---

2 The buy money was identified based on its serial numbers that had been noted before giving the money to CI-1.

22. We later field tested drugs seized and purchased from **CABRERA**. The drugs that CI-1 purchased from **CABRERA** earlier in the day and the powder seized from the Target Premises both field tested positive for heroin and based on my experience is likely a heroin/fentanyl mix. The 200 pills recovered from the target Premises field tested positive for oxycodone. Given the number of pills and the other items seized at the Target Premises, I believe that they were being possessed for resale rather than personal use.

23. Based upon the foregoing, I submit there is probable cause to believe that, on June 27, 2019, **CABRERA** possessed heroin and oxycodone, Schedule I and II controlled substances, with intent to distribute and distributed heroin in violation of Title 21, United States Code, Section 841(a).

Signed under the pains and penalties of perjury this ___ day of June, 2019.

_____
DANIEL CRONIN
TASK FORCE AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me, this 28th day of June, 2019.

_____
HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

-9-